J-A03030-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ADAM COLLIER BOYCE | |
| Appellant | No. 1143 MDA 2019 |

Appeal from the Judgment of Sentence Entered June 14, 2019
In the Court of Common Pleas of Centre County
Criminal Division at No.: CP-14-CR-0000642-2018

BEFORE:  LAZARUS, STABILE, and DUBOW, JJ.

MEMORANDUM BY STABILE, J.:          **FILED: MAY 11, 2020**

Appellant Adam Collier Boyce appeals from the June 14, 2019 judgment of sentence entered in the Court of Common Pleas of Centre County ("trial court"), following his stipulated bench conviction for three separate counts of driving under the influence ("DUI") of a controlled substance, disregarding a traffic lane, careless driving, and improperly exiting a limited access highway.[1] Upon review, we affirm.

Following a late-morning single vehicle accident that occurred on Route 322 West on January 31, 2018, Appellant was charged with the above-mentioned offenses.  Appellant waived his preliminary hearing.  On June 6, 2018, Appellant filed an omnibus pretrial motion.  Appellant argued that

---

[1] 75 Pa.C.S.A. §§ 3802(d)(1)(ii), (iii) and (2), 3309(1), 3714(a), and 3312, respectively.

Officer Heather Royer had illegally detained him after the accident on January 31, 2018, and that any evidence obtained as a result of the detention must be suppressed. Additionally, Appellant sought to suppress the results of his blood test, arguing that he did not voluntarily consent to the blood draw. The trial court conducted a two-day hearing at which both parties presented witness testimony. The Commonwealth first called to the stand Officer Royer, who worked as a police officer at the State College Police Department. N.T. Suppression, 9/6/18, at 3-4. Officer Royer testified that she had been employed at the police department for over 14 years. *Id.* at 4. According to her testimony, she was trained to recognize impaired drivers, including those under the influence of drugs. *Id.* She recalled completing various training programs in that regard. *Id.* at 4-5. Officer Royer further recalled that she had performed over 139 DUI stops in her 14-year career. *Id.* at 5. She testified that, as a police officer, she has weekly DUI encounters. *Id.*

Officer Royer then testified about the January 31, 2018 incident involving Appellant. While on routine patrol, she responded to and arrived at the scene of a single vehicle accident that occurred at 11:59 a.m. *Id.* at 6-7. According to Officer Royer, it was a "dry" day with "no adverse conditions" on the 5300 block of Mount Nittany Expressway, a straight section of roadway in Centre County, where the incident occurred. *Id.* at 6-7. Officer Royer testified that when she arrived at the scene, she observed a silver SUV resting "probably about 100 feet off the roadway." *Id.* at 7. She specifically recalled that "[t]here were tire impressions that I could see that went off the road.

- 2 -

They went over, like, a dead tree—dead log that was there and then came to rest against a fence and another tree on the driver's side of the vehicle." *Id.* The driver of the vehicle "was in the driver's seat" when Officer Royer arrived. *Id.* at 8. Officer Royer identified the driver as Appellant based upon his Pennsylvania driver's license. *Id.* She recalled that she could not initially speak to Appellant because "the tree was next to where he was seated." *Id.* at 9. However, when Appellant was later extracted from the vehicle, Officer Royer conversed with him.

> [H]e had said he had blacked out. He didn't remember crashing. He thought he could drive his vehicle from the scene. He stated— I asked him where he was coming from. He said he had been coming from the dentist in Lewistown. He said he had a tooth pulled. So I asked him if he was on any medication from having the tooth pulled, or did he have any prescriptions that he might have been taking due to having the tooth pulled that would impair his driving. He said no, that he had been numbed for the tooth extraction, but he didn't have any other medications. I asked him if there was anything else that might have affected his driving. He said, well, he had seizures in the past, and he hadn't had one in a year, but he didn't remember driving from Lewistown to Boalsburg. The last thing he remembered was leaving the dentist office.

*Id.* at 9-10, 24-25. Officer Royer testified that Appellant informed her that he "was headed to work in State College." *Id.* at 10. Describing Appellant's mental state, Officer Royer remarked: "He seemed okay. I mean, he thought that he could drive his vehicle from the scene, which he couldn't, but he was in the ambulance at the time, and he couldn't see the vehicle, but he was able to hold a conversation with me." *Id.* Officer Royer recalled that Appellant exhibited signs of impairment. *Id.* He "had bloodshot eyes. His face was flushed. It was also bloody, though. His blood pressure and his heart rate

- 3 -

were elevated." *Id.* She described Appellant's speech as "low and slow, which is a possible indication of drug use." *Id.* at 12. Officer Royer testified that, based on her experience and training, she suspected Appellant to be under the influence because "[h]e was involved in a one vehicle crash where there were no adverse conditions[.]" *Id.* at 16. He drove his vehicle "off the road in the middle of the day." *Id.* at 29. Specifically, "[h]is vehicle went off the road into a tree and a fence. He had bloodshot eyes, a flushed face. His heart rate and blood pressure were elevated. He was unsteady getting out of the vehicle." *Id.* at 17. Additionally, according to Officer Royer, confusion, memory loss and blackouts also are signs of impairment. *Id.* at 51.

Officer Royer, however, testified that she did not conduct a field sobriety test because Appellant "was injured and eventually transported to the hospital." *Id.* at 13. She recalled that he had blood on his hands and his face. *Id.* He also had blood "coming from his ear." *Id.* Officer Royer testified that Appellant was transported by ambulance to a hospital and that the decision to take him there was not made by law enforcement. *Id.*

Officer Royer went the hospital, where she spoke with a couple of nurses who were working in the emergency room. *Id.* at 14. "They had gone to high school with [Appellant] and had told me he had been a drug user for the past twenty years and that his girlfriend had died of a heroin overdose." *Id.* The nurses volunteered the information to Officer Royer. Officer Royer testified that, while at the hospital, she consulted with Sergeant Kelly Aston and Officer Brian Shaffer from Patton Township on the phone. *Id.* According to Officer

Royer, Sergeant Aston happened to be in a meeting with former Assistant District Attorney Michael Osterberg, with whom she consulted as well. *Id.* at 15. She shared with them the circumstances of Appellant's accident. *Id.* at 14. The parties advised Officer Royer to request a blood draw from Appellant. *Id.* at 15.

Officer Royer testified that she requested Appellant to submit to a blood draw. *Id.* She provided and read to him the implied consent form, DL-26B. Appellant consented, by signing the form. *Id.* at 16. He also agreed to the hospital paperwork, separately consenting to the blood draw. *Id.* When asked whether Appellant seemed confused as she was reviewing DL-26B with him, Officer Royer answered:

> No. He actually spoke to me more, I think it was when we were waiting for the lab tech to come and draw the blood, and whenever I read the DL-25 to him, he talked about he did remember then going to his house to take his dog out when he left the dentist. He told me he had wrecked on that same stretch of road before. So he was conversant and seemed okay.

*Id.* Officer Royer testified that Appellant was not handcuffed when she read him the DL-26B. *Id.* She also testified that she did not yell or raise her voice at him at any point in time. *Id.* at 17. She did not threaten him. *Id.* She also did not draw her weapon. *Id.* She did not use physical force against Appellant. *Id.* She recalled that her investigation for this case indicated that Appellant previously was arrested for DUI in 2006 and 2014. *Id.* at 20. The Appellant's blood was drawn at 2:00 p.m. *Id.* at 52.

On cross-examination, Officer Royer acknowledged that another officer had reached the scene of the accident before her. *Id.* at 21. She further acknowledged that Sergeant Aston and Officer Shaffer were not at the scene and did not observe Appellant. *Id.* at 22-23. Officer Royer conceded that she did not witness the accident. *Id.* at 23. She also conceded that she did not notice any odor of alcohol emanating from Appellant's vehicle or his clothes. *Id.* at 26-27. Officer Royer acknowledged that she did not observe any drug paraphernalia in the vehicle or on Appellant's person. *Id.* at 27. She also acknowledged that, even if the paramedics had not taken him to the hospital for treatment on a doctor's advice, Appellant still would not have been free to leave on account of investigative detention. *Id.* at 28, 30, 41-42. Finally, Officer Royer conceded that she was not a drug recognition expert. *Id.* at 49.

The Commonwealth next presented the testimony of Officer Shaffer, who testified that he was employed as a patrolman for over sixteen and one-half years. *Id.* at 55-56. He testified that he became a drug recognition expert ("DRE") in 2014. *Id.* at 56. Officer Shaffer recalled that, on January 31, 2018, he received a telephone call from Officer Royer concerning a potentially impaired driver. *Id.* He testified:

> [Officer Royer] contacted me on the phone saying that she had a single vehicle crash that had gone off of the roadway in the – somewhere on Mount Nittany Expressway. She stated it was a fairly straight road. There were no adverse weather conditions. She said that the individual involved in the crash, the driver, had to be taken to the hospital for treatment, and she asked if I was capable of doing a DRE under those circumstances. I'm not. I've attempted to examine people at the hospital for a drug eval, and it doesn't work well. I can't do a lot of the field tests that I otherwise would do, and I'm limited in my ability to assess people, especially if they're undergoing treatment. Our greater concern

- 6 -

as part of the DRE evaluation process is to make sure the people are medically okay.

But she then outlined some of the other aspects of the crash, some of the information she had received from the onsite EMS about the individual's blood pressure, his pulse being elevated. She noticed that he had bloodshot eyes, as I recall, stated there were folks at the hospital who had advised her that he had a history of drug use, and she wondered, asking me as not just a drug recognition expert but also as an SFST instructor, if she had enough to proceed with a blood draw. I stated that under those circumstances I would proceed with a blood draw and request blood using the DL-26.

*Id.* at 56-57 (sic). Officer Shaffer relayed that, based on his training and experience and the information furnished by Officer Royer, he opined that Appellant was under the influence of drugs and advised Officer Royer to request general toxicology and the expanded pharmaceuticals tests. *Id.* at 57-58. Officer Shaffer ruled out alcohol because "there was no presence of alcohol that [he] was aware of." *Id.* at 58.

On cross-examination, Officer Shaffer clarified that he merely "advised" Officer Royer that, in his opinion, she had sufficient grounds to ask Appellant to submit to a blood draw. *Id.* at 62. He acknowledged that he did not perform a DRE because that was outside the scope of Officer Royer's phone call. *Id.* at 63.

In response, Appellant called to the stand Matthew Burnheimer, a paramedic at Centre LifeLink in State College, who testified about the January 31, 2018 motor vehicle incident involving Appellant that occurred on Route 322 West. N.T. Suppression, 12/20/18, at 3-6. Mr. Burnheimer testified that, when he arrived at the scene, he observed that "it looked like [Appellant's] vehicle was about a hundred yards off of 322 and then came to stop upon a

fence post." *Id.* at 6. According Mr. Burnheimer, Appellant "was inside the vehicle. He was awake and talking. So we could tell he was breathing and okay at that point." *Id.* Mr. Burnheimer recalled that although Appellant "wasn't bleeding profusely from anywhere," he was bleeding from his nose. *Id.* Mr. Burnheimer testified that, as a result of the bleeding, there was a concern "about a head injury." *Id.* at 7.

Mr. Burnheimer testified that Appellant's pupils were "equal and reactive," and thus presented no concern. *Id.* He further testified that the bridge of Appellant's nose "looked off" and that the nose appeared to be swollen. *Id.* at 7-8. He recalled that Appellant was alert to the extent he "knows who he is. He knew where he was, and he was understanding about the time of day." *Id.* at 9. Appellant did not have slurred speech. *Id.* He was speaking "normally." *Id.* As a result, Mr. Burnheimer ruled out the possibility of a stroke. *Id.*

Furthermore, Mr. Burnheimer recalled that Appellant's motor sensory skills were normal. *Id.* at 9-10. Appellant scored a 15 out of 15 on the "Glasgow Coma Score," which gauged his level of consciousness, *i.e.*, his ability to react, his ability to speak, and his response level to pain. *Id.* at 10-11. Finally, Mr. Burnheimer testified that he wrote "unknown" in his report with respect to suspecting drugs or alcohol. *Id.* at 12. He explained that he "wasn't able to say affirmative that yes or no. We weren't sure." *Id.* (sic).

On cross-examination, he noted that his purpose at the accident scene was "[t]o care for the patient and other patients. We're there for the patients."

*Id.* at 13. He acknowledged that, upon arrival, his first thoughts were to rule out major injuries, such as "trauma to the head, broken bones, things of that nature," to the patient. *Id.* He further acknowledged that it "was a secondary concern" to look for possible involvement of drugs or alcohol. *Id.* He explained that he did not carry any equipment to test on the spot whether a patient had drugs or alcohol in his or her system. *Id.* at 14. Mr. Burnheimer conceded that he did not "dig too much into" whether Appellant was under the influence of drugs or alcohol. *Id.*

He also conceded that Appellant did not want to go to the hospital. *Id.* According to Mr. Burnheimer, given Appellant's adamancy, he called a doctor at the hospital to discuss Appellant's case. *Id.* at 15. "I spoke to the doctor and said that [Appellant] didn't remember the incident, and he did have the injuries to the face so we thought maybe a head injury, and the doctor at the hospital said the patient may not refuse and has to go to the hospital." *Id.* In other words, "it was doctor's orders to come to the hospital, and that's what led to him being there[.]" *Id.*

On March 5, 2019, following hearing and subsequent briefing by the parties, the trial court issued an order denying Appellant's omnibus motion. On April 22, 2019, the case proceeded to a stipulated bench trial at the conclusion of which the trial court found Appellant guilty of three separate counts of DUI of a controlled substance, disregarding a traffic lane, careless driving, and improperly exiting a limited access highway. On June 14, 2019, the trial court sentenced Appellant to, *inter alia*, an aggregate term of 72

hours to 6 months' imprisonment. Appellant timely appealed. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant complied. In response, the trial court issued a Pa.R.A.P. 1925(a) opinion.

On appeal, Appellant presents three issues for our review. For ease of disposition, we combine his first two issues as they relate to the trial court's denial of his suppression motion. Specifically, Appellant argues that he was subjected to an unlawful detention when he was taken to the hospital against his wishes and that his consent to the blood draw was involuntary due to coercion. Separately, he also argues that the trial court erred in concluding that his conviction for careless driving was supported by sufficient evidence.

We first address Appellant's claim that the trial court erred in denying his suppression motion. In reviewing appeals from an order denying suppression, our standard of review is limited to determining

> whether [the trial court's] factual findings are supported by the record and whether [its] legal conclusions drawn from those facts are correct. When reviewing the rulings of a [trial] court, the appellate court considers only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. When the record supports the findings of the [trial] court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Griffin*, 116 A.3d 1139, 1142 (Pa. Super. 2015). Our scope of review is limited to the evidence presented at the suppression hearing. *In re interests of L.J.*, 79 A.3d 1073, 1088-89 (Pa. 2013).

Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution protect the people from unreasonable searches and seizures. ***Commonwealth v. Lyles***, 97 A.3d 298, 302 (Pa. 2014) (citation omitted). The ***Lyles*** Court explained:

> Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police. The first, a "mere encounter," does not require any level of suspicion or carry any official compulsion to stop and respond. The second, an "investigatory detention," permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.

> In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances. . . . The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and [our Supreme] Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

> [Our Supreme] Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. Officers may request identification or question an individual so long as the officers do not convey a message that compliance with their requests is required. Although police may request a person's identification, such individual still maintains the right to ignore the police and go about his business.

*Id.* at 302-03 (internal citations and quotation marks omitted). "We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." ***United States v. Mendenhall***, 446 U.S. 544, 553 (1980).

Instantly, Appellant argues only that Officer Royer lacked reasonable suspicion to detain him for investigative purposes. It is settled that reasonable suspicion necessary for investigative detentions

> is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

***Commonwealth v. Davis***, 102 A.3d 996, 1000 (Pa. Super. 2014) (citations omitted). "In order to justify an investigative detention, the police must have reasonable suspicion that criminal activity is afoot. Reasonable suspicion must be based on specific and articulable facts, and it must be assessed based upon the totality of the circumstances viewed through the eyes of a trained police officer." ***Commonwealth v. Williams***, 980 A.2d 667, 672 (Pa. Super. 2009) (citation omitted), ***appeal denied***, 990 A.2d 730 (Pa. 2010). Thus, "[t]he determination of whether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances."

***Commonwealth v. Holmes***, 14 A.3d 89, 96 (Pa. 2011) (emphasis added).

In assessing the totality of the circumstances, a court ***must give weight to***

***the inferences*** that a police officer may draw through training and

experience. ***Id.*** at 95. Reasonable suspicion does not require that the activity

in question must be unquestionably criminal before an officer may investigate

further. ***Davis***, 102 A.3d at 1000 (citations omitted). "Rather, the test is

what it purports to be—it requires a suspicion of criminal conduct that is

reasonable based upon facts of the matter." ***Id.*** (citation and emphasis

omitted).

Here, based upon the totality of the circumstances of this case, as

detailed above,[2] it is beyond peradventure that Officer Royer had reasonable

suspicion to detain Appellant for DUI.[3] As the trial court found:

> Officer Royer responded to a report of a one vehicle crash on
> Mount Nittany Expressway. The officer testified there were no
> adverse weather or road conditions on that day to cause
> [Appellant] to go off the road. [Appellant] had no recollection of
> the accident. He did not remember leaving the dentist's office or
> driving from Lewistown to Boalsburg. Officer Royer also testified

---

[2] To the extent Appellant invites us to accept his proffered version of the facts or to credit his testimony, we decline the invitation. ***See Commonwealth v. Fudge***, 213 A.3d 321, 326 (Pa. Super. 2019) (citation omitted) (noting that we will not disturb a suppression court's weight and credibility absent a clear and manifest error), ***appeal denied***, No. 422 MAL 2019, 2019 WL 7207309 (Pa. filed December 27, 2019); ***see also Commonwealth v. McCoy***, 154 A.3d 813, 816 (Pa. Super. 2017) ("[I]t is within the lower court's province to pass on the credibility of witnesses and determine the weight to be given to their testimony.").

[3] The Commonwealth seemingly concedes that Officer Royer enforced the doctor's directive for Appellant to go to the hospital and that Appellant was under investigative detention from the time he was in the ambulance following the crash.

to observing [Appellant's] bloodshot eyes, flushed face, low and slow speech, and elevated heart rate and blood pressure. As an officer experienced in recognizing symptoms of a person driving under the influence, Officer Royer deducted that [Appellant] may have been impaired. At this point, [Appellant] was under an investigative detention while in the ambulance transporting him to the hospital.

Officer Royer's suspicions [Appellant] may have been driving while impaired were further heightened after she was approached by two hospital nurses who informed her of [Appellant's] history of drug use. Armed with this information and her observations from earlier in the day, Officer Royer contacted her more experienced colleagues to gain advice on moving forward with the investigation. That is when her colleagues informed her that she should obtain a blood draw from [Appellant].

While Officer Royer asked [Appellant] to give a blood sample only after seeking advice from her colleagues, at all times prior to receiving that advice, Officer Royer had the requisite reasonable suspicion gleaned from her earlier observations, training, and experiences to lawfully detain [Appellant]. Thus, the [c]ourt finds that [Appellant] was not subjected to an unlawful investigative detention.

Trial Court Opinion, 3/5/19, at 5-6. Thus, Officer Royer relied on her training, experience, observations of Appellant and the circumstances surrounding the accident to reasonably conclude that Appellant was driving under the influence to justify an investigatory detention. Accordingly, the court did not err in denying Appellant's motion to suppress.

We now address Appellant's argument that his consent to the blood draw was involuntary because it was obtained through coercion.

In *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016), the Supreme Court addressed the constitutionality of warrantless searches of breath and blood under the Fourth Amendment, specifically with regard to the search-incident-to-arrest and consent exceptions to the warrant requirement. *Id.* at 2184. The Court held, *inter alia*, that "the Fourth Amendment permits

- 14 -

warrantless breath tests incident to arrests for drunk driving[,]" but "reach[ed] a different conclusion with respect to blood tests." *Id.* Because obtaining a blood sample is significantly more intrusive than a breath test, the Court determined that a blood test may not be administered as a search incident to arrest. *Id.* at 2185.

> The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures." *Commonwealth v. McAdoo*, 46 A.3d 781, 784 (Pa. Super. 2012). "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." *Commonwealth v. Strickler*, 757 A.2d 884, 888 (Pa. 2000). "Exceptions to the warrant requirement include the **consent exception**, the plain view exception, the inventory search exception, the exigent circumstances exception, the automobile exception . . ., the stop and frisk exception, and the search incident to arrest exception." *Commonwealth v. Dunnavant*, 63 A.3d 1252, 1257 n.3 (Pa. Super. 2013). The "administration of a blood test . . . performed by an agent of, or at the direction of the government" constitutes a search under both the United States and Pennsylvania Constitutions. *Commonwealth v. Kohl*, 615 A.2d 308, 315 (Pa. 1992); *Schmerber*[, 384 U.S. at 770].

*Commonwealth v. Evans*, 153 A.3d 323, 327-28 (Pa. Super. 2016) (brackets omitted) (emphasis added). "One such exception is consent, voluntarily given." *Strickler*, 757 A.2d 888 (citation omitted). Under the Fourth Amendment, where an encounter between law enforcement is lawful, voluntariness of consent to a search becomes the exclusive focus. *Id.* In *Commonwealth v. Smith*, 77 A.3d 562 (Pa. 2013), our Supreme Court explained:

> In determining the validity of a given consent, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances. The standard for measuring the

> scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent. Such evaluation includes an objective examination of the maturity, sophistication and mental or emotional state of the defendant. Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation.

**Smith**, 77 A.3d at 583 (citations, quotation marks and ellipses omitted). In explicating voluntariness under similar circumstances, we have stated:

> While there is no hard and fast list of factors evincing voluntariness, some considerations include: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel.

**Commonwealth v. Geary**, 209 A.3d 439, 443 (Pa. Super. 2019) (citation omitted).

It is well settled that in DUI cases, a police officer requesting that a motorist submit to a warrantless blood draw "ha[s] no obligation to enlighten [the motorist] as to the full details of federal constitutional law; [the police officer] only need[] tell [the motorist] the current, legal consequences of refusing to consent to the blood-draw." **Commonwealth v. Venable**, 200 A.3d 490, 498 (Pa. Super. 2018) (citation omitted; bracketed information amended; emphasis added); **see also Commonwealth v. Myers**, 164 A.3d 1162, 1171 (Pa. 2017).

Here, Appellant claims that his consent was involuntary because it was preceded by his unlawful detention and thus, obtained through coercion. As

explained above, his detention was not unlawful as Officer Royer had reasonable suspicion. Moreover, the trial court explained:

> [Appellant] was not under any physical restraints. The Officer read the DL-26 form to [Appellant] and testified at the hearing that [Appellant] seemed alert and talkative. For good measure, Officer Royer also read the hospital's consent form to [Appellant]. [Appellant] signed form DL-26, thereby giving his consent to the blood draw.
>
>  . . . .
>
> Officer Royer testified at the suppression hearing that she did not yell or threaten [Appellant] to obtain a blood sample. [Appellant] did not present any evidence or testimony to refute Officer Royer's claim. Thus, there is no evidence of coercion. [Appellant] was not physically harmed, nor subjected to unusual pressure. Nothing in the contents of the DL-26 deprived [Appellant] of his ability to make a free decision regarding whether to sign the DL-26 form. Th[e c]ourt finds [Appellant's consent was not the product of duress or coercion, and, under the totality of the circumstances, [Appellant] voluntarily signed DL-26 form and consented to the warrantless blood draw.

Trial Court Opinion, 3/5/19, at 6-7. Accordingly, based upon the totality of the circumstances, Appellant does not obtain relief. *See Commonwealth v. Robertson*, 186 A.3d 440 (Pa. Super. 2018) (finding consent voluntary where police did not use coercive tactics, defendant was informed of her right to refuse, and subsequently cooperated with the blood draw), *appeal denied*, 195 A.3d 852 (Pa. 2018).

We finally address Appellant's argument that the evidence presented at the stipulated non-jury trial was insufficient to establish that he committed the offense of careless driving.

A claim challenging the sufficiency of the evidence is a question of law." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000).

- 17 -

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014).

Section 3714(a) of the Vehicle Code provides that "[a]ny person who drives a vehicle in careless disregard for the safety of persons or property is guilty of careless driving, a summary offense." 75 Pa.C.S.A. § 3714(a). This court has defined the *mens rea* for careless driving, "careless disregard," as "less than willful or wanton conduct but more than ordinary negligence." *See Commonwealth v. Gezovich*, 7 A.3d 300, 301 (Pa. Super. 2010).

Here, based upon our review of the evidence, as detailed above and viewed in a light most favorable to the Commonwealth as the verdict winner, we agree with the trial court's conclusion that the Commonwealth proved beyond a reasonable doubt that Appellant committed careless driving. The trial court found Appellant guilty of careless driving on the following stipulated facts:

1. Thomas Bland Cunningham was driving in the right lane on 322-W just west of the Old Fort exit.

2. Mr. Cunningham saw a vehicle behind him in the right lane start to swerve. The vehicle then started to swerve back and forth across the entire roadway, before swerving off the road and into the grassy area and crashed into a fence.

3. Mr. Cunningham pulled over onto the side of the road and called 911.

4. Mr. Cunningham would not be able to testify to the cause of [Appellant's] accident.

. . . .

5. Officer Royer would testify consistently with her testimony at the Omnibus hearing held on September 6, 2018. . . .

6. Officer Royer read the DL-26 Implied Consent Form to [Appellant], and [Appellant] signed said form. . . .

7. Additionally, Officer Royer would testify that on March 6, 2018, Officer Royer called [Appellant] to advise him he would be charged with DUI. [Appellant] responded, "I knew you were going to charge me, I'm not retarded."

. . . .

8. Matthew Burnheimer would testify consistent with his testimony at the Continued Omnibus hearing held on December 20, 2018. . . .

. . . .

9. [William Anderson would testify that he] is employed as a Lab Tech at the Mount Nittany Medical Center.

10. He is qualified by his education and experience to withdraw blood from an individual for testing purposes; specifically, the testing of one's blood to determine its alcohol concentration.

11. At 1401hours—or 2:01 P.M.—on January 31, 2018, a sample of blood was legally withdrawn from the arm of [Appellant] by Mr. [Anderson].

12. The chain of custody of the evidence was protected at all times.

. . . .

13. [Forensic Toxicologist] Sherri L Kacinko[, Ph.D., F-ABFT] is employed by NMS Labs in Willow Grove, Pennsylvania.

14.     [She] is an expert in the field of blood analysis.

     . . . .

15.     [Ms. Kacinko] tested [Appellant's] blood using Gas Chromatography/Mass Spectrometry and High Performance Liquid Chromatography/Tandem Mass Spectrometry.

16.     [She] analyzed [his] blood and determined [his] blood contained: Benzoylecgonine 820 ng/mL, Tramadol 840 ng/mL, O-Desmethyltramadol 48 ng/mL, Buprenorphine 0.90 ng/mL, and Norbuprenorphine 1.4 ng/mL. . . .

17.     The proper medical and legal procedures were followed in obtaining and testing the blood sample.

18.     The chain of custody of the evidence was protected at all times.

Stipulation, 4/22/19, at 1-3 (paragraphs renumbered).  The trial court

explained:

> Mr. Cunningham witnessed a car swerving back and forth on the road, and then crashing into a fence.  Mr. Cunningham's stipulated testimony does not directly identity [Appellant] as the driver of the vehicle, but his testimony in conjunction with Officer Royer's testimony that she witnessed [Appellant's] SUV resting against a fence on the side of the road led the [c]ourt to infer Mr. Cunningham's stipulated testimony referred to the actions of [Appellant].  There were no adverse conditions or other imposing vehicles which would have caused [Appellant] to swerve so violently on the road and crash into a fence.  The presence of controlled substances in [his] blood along with the aforementioned evidence proves beyond a reasonable doubt [Appellant] was driving with a careless disregard for the safety of persons and property.

Trial Court Opinion, 8/29/19, at 2-3.  Therefore, based upon the foregoing

evidence and viewed in a light most favorable to the Commonwealth, we agree

with the trial court that the Commonwealth proved beyond a reasonable doubt

that Appellant committed careless driving.

In sum, we conclude that the trial court did not err in denying Appellant's

motion to suppress based on his contention that his detention was unlawful

and that his consent to the blood draw was involuntary due to coercion. We also conclude that sufficient evidence supported Appellant's conviction for careless driving. We, therefore, affirm the trial court's June 14, 2019 judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/11/2020